STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ADAM A. REEVES (CABN 2363877)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    adam.reeves@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 05-CR-00611 WHA |
| Plaintiff, | **RESPONSE TO PETITION FOR COMPASSIONATE RELEASE** |
| v. | |
| KURT F. JOHNSON, | |
| Defendant. | |

Defendant Kurt F. Johnson seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied for multiple reasons. First, according to CDC guidance, the defendant's hypothyroidism and weight gain do not present a medical condition that places him at an enhanced risk during the pandemic. (https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html) "Hypothyroidism" is defined as "deficient activity of the thyroid gland" with "a resultant bodily condition characterized by lowered metabolic rate and general loss of vigor." Merriam-Webster Dictionary (2021 online ed.). Second, the defendant has declined a vaccination against COVID-19 "for religious reasons." Defendant's Petition for Compassionate Release Under 3582 dated August 5, 2021 (Document 852) at 4. Consequently, if released, the defendant represents a danger to the community. Third, the defendant has not finalized his request for compassionate release with the

Bureau of Prison and therefore he has not fully exhausted his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A).  These facts and circumstances do not rise to the extraordinary and compelling level needed to merit compassionate release.

**I.     Background**

**A.     Criminal Conduct**

On March 11, 2008, the United States filed its Sentencing Memorandum (Document 583 at 1-3). The following description of the underling criminal conduct in this case quotes from the government's Sentencing Memorandum:

"On November 14, 2007, Defendant Johnson was convicted by a jury of thirty-four counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of conspiracy to commit mail fraud, bank fraud, or wire fraud, in violation of 18 U.S.C. § 1349.  At trial, evidence was presented that in 2003, … Johnson [and a co-defendant] created The Dorean Group, which operated a purported debt elimination scheme from its offices in the Northern District of California.  Johnson continued to operate the Dorean Group scheme until he was arrested in mid-2005."

"The Dorean Group debt elimination program was an elaborate, multi-step process in which mortgage loan borrowers paid the Dorean Group $3,000 (on average) in exchange for alleged elimination of the borrowers mortgage loan.  Johnson and cofounder and codefendant D. Scott Heineman solicited client borrowers over the internet and by word of mouth.  To induce borrowers to become Dorean Group clients, Johnson and Heineman lied to borrowers and told them that they had successfully eliminated home loans – starting with Heineman's own home loan.  In a marketing video shown during the trial, Johnson boasted that Heineman was the Dorean Group "guinea pig" and that the process was "tested" and "successful."  In fact, Heineman's home was ultimately foreclosed upon, and the Dorean Group was never successful in eliminating any mortgage loans."

"Once borrowers became Dorean Group clients, they signed over their interest in their homes to Heineman and Johnson as trustees.  Heineman and Johnson then sent the lending institution what they called a "presentment" consisting of numerous pages of incoherent ranting about how the lender was alleged to have committed wrongdoing in granting the mortgage loan.  The presentment stated that if the lender did not respond satisfactorily to each and every one of the more than fifty incomprehensible

allegations contained in the presentment, that the lenders silence would be deemed acceptance of the allegations of wrongdoing and Heineman and Johnson would be granted power of attorney to dispose of the lender's interest in the property.  When the lenders did not respond in a way Heineman and Johnson deemed appropriate (they never deemed any lender response satisfactory), or did not reply at all, Heineman and Johnson filed documents at the appropriate county clerk's office stating that the lender gave up all interest in the property.  Heineman and Johnson would then file a Full Reconveyance or its equivalent in that county granting full property title to the client/borrower."

"Following the filing of these documents at the county clerk's office, Heineman and Johnson would convince borrowers that the Dorean Group process had been successful, and that the borrower owned the home free and clear.  Heineman and Johnson told borrowers that they could stop paying their mortgage loans.  The most lucrative step in the process came next: Heineman and Johnson convinced borrowers to take the fraudulent Full Reconveyance documents to another lending institution and take out another loan secured by the still encumbered property.  Fortunately, because authorities discovered the Dorean Group scheme in time and because many lenders learned the truth about the existing encumbrances through title searches, few of the 2,500 to 3,500 Dorean Group clients nationwide refinanced their properties."

"For those who did refinance, which included five borrowers' properties alleged in separate counts of the indictment, borrowers paid 50% of the proceeds of the new loan to Heineman and Johnson and 25% of the proceeds to the broker.  The homeowner, however, even after giving away 75% of the loan proceeds, was left responsible for repayment of the entire loan in addition to the original loan which was never really paid off.  The most egregious case of exploitation through refinancing came out at trial through the testimony of borrowers Peggy and Tim McKay.  The McKay's niece, Sara Magoon, told them about the Dorean Group and put them directly in touch with Heineman and Johnson.  Heineman and Johnson admitted at trial that Magoon was one of their brokers.  Both Heineman and Johnson talked on the phone with the McKays and convinced them to mortgage their home to the hilt not once, but twice, paying directly to Heineman and Johnson a total of more than $192,000.  The McKays are now responsible for repaying that money to the lender."

"Johnson and Heineman hired 19 brokers all over the country to work for them as brokers, marketing the Dorean Group process to borrowers and funneling clients to the Dorean Group in California.  For each property that a borrower put through the Dorean Group process, Johnson and Heineman directed the mailing of a presentment packet to the mortgage lender and reconveyance documents to the county clerk's office.  For each of the counts in the indictment there are certified mail receipts proving that mailings were made to lenders and county clerk's offices for each property." *See generally* Document 583.

On March 19, 2008, the Court sentenced Johnson, now 58 years old, to a total term of 300 months in prison.  The sentence consisted of a 240-month sentence for Count One (Conspiracy to Commit Mail Fraud) to be served consecutively to 60-month sentences, running concurrently, for Counts Two through Five, Nine through Fourteen, Thirty-Three, Thirty-Four, and Thirty-Eight through Fifty-Two (specific counts of Mail Fraud).  *See generally* Judgment in a Criminal Case (Document 596).  The defendant, Federal Inmate Register Number 13177-081, is serving his sentence at Terre Haute FCI in Indiana.  According to the Bureau of Prisons (BOP), Johnson has served approximately 42% of his statutory term.   His anticipated release date is December 8, 2043 (https://www.bop.gov/inmateloc/).

Johnson has a significant disciplinary record with the Bureau of Prisons.  His Chronological Disciplinary Record (available upon request to the Court) is approximately twelve pages long.  It includes numerous citations for "refusing to obey an order," "giving/accepting money without authorization," refusing to appear, "failing to stand count," etc.  More seriously, in or about July 2006, Johnson was sanctioned for criminal "mail abuse" for making a fake "order of dismissal" purportedly ordering the "immediate release" of Johnson and Heineman and forging the signature of the United States District Court Judge and seal of the Court.  According to the Bureau of Prisons, this fake order was created after the Court had granted Johnson and Heineman special access to computers and printers for their defense.  According to the docket in this case, on July 18, 2006, the Court found that the "order of dismissal" was "not a legitimate order of the court."  Document 140.

**B.    The Defendant's Health and Request for Compassionate Release**

The defendant's medical records from the Bureau of Prisons indicate that Johnson has been treated for "Hypothyroidism unspecified" since June 2012.  They further indicate that the defendant has

also been treated for "unspecified hyperlipidemia" since August 2016. Neither of these conditions are listed as medical conditions that, according to CDC guidance (https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html), place him at an enhanced risk during the pandemic. Finally, the defendant has declined to be vaccinated for COVID-19. Document 852 at 4.

In his Petition, the defendant contends that the requirement to exhaust administrative remedies and apply for compassionate release directly with the Bureau of Prisons "has been met." Document 852 at 1. Counsel for the government has been unable to verify this claim. According to the Bureau of Prisons, BOP has checked its national database of administrative filings and has "turned up negative results" for any petition by Johnson to BOP for compassionate release. (BOP is still checking directly with FCI Terre Haute to see if any request was made locally but not yet included in the national database.) (Email correspondence with BOP is available upon request.) Even if a petition to BOP has recently been made locally, the absence of any indication of this request in the BOP records suggests that it has not been adjudicated and therefore the defendant's administrative remedies have not been exhausted as required by 18 U.S.C. § 3582(c)(1)(A).

### C. BOP's Response to the COVID-19 Pandemic

As the Court is aware, from the moment the pandemic began, the Bureau of Prisons made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened

for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[1] This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population is now more than 10% less than it was at the outset of the pandemic, standing at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful, now abetted by widespread vaccination (discussed below). It is notable that the rate of deaths in federal prisons has been comparable to that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.[2] Further, the incidence of positive cases in all BOP institutions has been sharply declining for months, with nearly all institutions currently reporting no cases or case tallies in the single digits.

---

[1] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Aguibi*, -- F. App'x --, 2021 WL 2623415, n.2 (3d Cir. June 25, 2021) (not precedential; per curiam) ("To the extent that Aguibi requested a transition to home confinement, the Bureau of Prisons has the sole authority to place a prisoner in home confinement."); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021); *United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

[2] While there have been 242 inmate deaths related to COVID-19 at BOP institutions (which at the outset of the pandemic held over 157,000 inmates), there have been over 615,000 deaths in the general population. Both figures represent tragedies, but the defendant has not shown that the toll in BOP facilities is materially worse than in the rest of the country.

### D. Vaccinations

BOP worked with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP received the COVID-19 vaccines as they became available, and then offered the vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and then offering the vaccines to inmates in order of priority of need in accordance with CDC guidelines. As a court observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

As of this writing, through an intensive effort over the past months, BOP has offered a vaccine to every inmate in BOP-managed institutions. BOP has administered a total of 218,091 doses to inmates and staff. Going forward, BOP will continue to offer vaccines to newly arrived inmates, and to those inmates who initially declined a vaccine if they change their minds, as expeditiously as possible as supplies are available. The clinical guidance provided to BOP health services professionals is available at https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

## II. Discussion

### A. Governing Law

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days

from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

> (i) extraordinary and compelling reasons warrant such a reduction . . .
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."[3]

The Sentencing Guidelines policy statement appears at § 1B1.13 and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Although not binding in all circuits, the courts of appeals have recognized that it continues to provide important "guideposts," *United States v. McGee*, 992 F.3d 1035, 1045 (10th Cir. 2021); *see United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) ("Although not dispositive, the commentary to the United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 informs our analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused."); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir.

---

[3] The inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States,* 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

2021). The issue is particularly immaterial where, as here, the motion rests on medical grounds, and the Commission has stated a well-accepted definition of the circumstances that qualify as extraordinary. *See United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021) (while the Fourth Circuit holds that "§ 1B1.13 is not applicable to *defendant-filed* motions under § 3582(c)," the court recognizes that "it defines, in the medical context, the same substantive term that applies to *BOP-filed* motions. One might reasonably believe therefore that the term 'extraordinary and compelling reasons' will be defined the same for *defendant-filed* motions.").

In application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  Medical Condition of the Defendant.—
>
> (i)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii)  The defendant is—
>
> (I)  suffering from a serious physical or medical condition,
> (II)  suffering from a serious functional or cognitive impairment, or
> (III)  experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B)  Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C)  Family Circumstances.—
>
> (i)  The death or incapacitation of the caregiver of the defendant's minor child or minor children.

          (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

        (D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).

Among other arguments in support of the petition, the defendant contends that his cooperation and assistance relating to a violent incident at FCI Terre Haute merits compassionate release. Document 852 at 7-8. While laudable and not to be diminished, the defendant's cooperation regarding the alleged assault and murder of other inmates would qualify as extraordinary and compelling only under Subsection D of the Application Note describing "Other Reasons" for compassionate release. But, to qualify under Subsection D, the "other reason" must be determined by the Director of the Bureau of Prisons, which has not happened.

**B.**    **COVID-19 and Compassionate Release**

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit therefore held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) (not precedential) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide

the sole basis for granting release to each and every prisoner within our Circuit."); *see also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) (Van Bokkelen, J.) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

The government acknowledges, however, that an inmate who has not been offered a vaccine, who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 463 F. Supp. 3d 585, 597 (W.D. Pa. 2020) (Ranjan, J.)). *See also United States v. Elias*, 984 F.3d 516, 521 (6th Cir. 2021) (affirming denial of compassionate release and observing that "the district court properly considered the CDC guidance that was in effect at the time . . . . Relying on official guidelines from the CDC is a common practice in assessing compassionate-release motions.").

The CDC's list of risk factors appears at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that "can make you more likely to get severely ill from COVID-19." An inmate who has not been offered a vaccine, who presents a condition on that list, presents an "extraordinary and compelling reason" allowing consideration of compassionate release.[4]

---

[4] Before March 29, 2021, the CDC presented two separate lists of conditions that either definitively entailed a greater risk of severe illness or "might" entail a greater risk of severe illness. Those "might" conditions were asthma (moderate-to-severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; overweight; pulmonary fibrosis; thalassemia; and type 1 diabetes mellitus. At that time, the government maintained—and most courts agreed—that inmates with conditions on the "might" list did not present an extraordinary basis for relief. *See, e.g., United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (Cogburn, J.); *United States v. Moldover*, 2020 WL

## C. The Defendant's Circumstances

Here, the defendant is not eligible for compassionate release because he has not identified any condition that he currently has that is on the CDC's list of risk factors, or indeed any chronic medical ailment. The motion should therefore be denied. *See, e.g.*, *United States v. Williams*, 2020 WL 4001045, at *2 (E.D. Pa. July 14, 2020) (Bartle, J.) (denied for inmate who presents no health conditions); *United States v. Cato*, 2020 WL 4193055, at *2 (E.D. Pa. July 21, 2020) (Beetlestone, J.) (same); *United States v. Moore*, 2020 WL 4193012, at *1 (E.D. Pa. July 21, 2020) (Pappert, J.) (same); *United States v. Ramirez-Ortega*, 2020 WL 4805356, at *2 (E.D. Pa. Aug. 18, 2020) (DuBois, J.) (same); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (Drain, J.) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) (denied for 61-year-old with no other conditions). *See also United States v. Crawford,* 2019 WL 6615188 (M.D.N.C. Dec. 5, 2019) (66-year-old man with a variety of health conditions does not suffer from a terminal illness, the illnesses have not substantially diminished his ability to care for himself while incarcerated in the BOP, and BOP can treat the conditions; the medical conditions therefore "do not constitute extraordinary or compelling reasons warranting a sentence reduction.")

Moreover, the defendant was offered the vaccine, and he refused it. That similarly precludes eligibility for compassionate release. *See, e.g.*, *United States v. Baeza-Vargas*, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021) (Teilborg, J.) ("Judges of this Court, as well as others around the country,

---

6731111, at *9 (E.D. Pa. Nov. 13, 2020) (Slomsky, J.) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension.").

In the March 29 revision, the CDC merged the two lists without extensive explanation. The CDC also presents a page with information for healthcare providers, which discusses the evidentiary basis for designating each risk factor and indicates that there remains less extensive support for drawing conclusions regarding most conditions formerly listed as "might" factors. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html. The government nevertheless continues to follow CDC guidance and therefore relies on the CDC's expanded list to define what constitutes an "extraordinary and compelling" basis for consideration of compassionate release of an inmate who has not been offered a vaccine.

It also bears noting that although age is not listed as a separate risk factor, the CDC has emphasized that it is an important indicator of risk. The CDC page regarding risk factors states: "More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45."

RESPONSE TO PETITION                                          12
05-CR-00611 WHA

have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances.") (citing more than a dozen cases).

In addition, the only risk factor that the defendant presents are hypothyroidism and being overweight. Courts have often denied compassionate release based on mild obesity alone, particularly where the defendant is relatively young and does not present any related ailment.[5] *See, e.g.*, *United States v. Lucero*, 2021 WL 1297828, at *2 (S.D. Cal. Apr. 7, 2021) (Sabraw, J.) (BMI of 29 does not warrant release); *see also United States v. Pearson,* 2020 WL 7706618, at *3 (E.D. Mich. Dec. 29, 2020) (Parker, J.) (borderline obesity in 25-30 BMI range is not sufficient; "This Court is reluctant to find extraordinary and compelling circumstances warranting the release of inmates where the CDC's guidelines reflect only a possible heightened risk of severe illness from COVID-19, particularly where the condition at issue is one experienced by almost three quarters of the United States population over age twenty."); *United States v. Magnus*, 2021 WL 1627290, at *2 (D.S.D. Apr. 27, 2021) (Schreier, J.) (obesity with BMI of 32.3 is not sufficient); *United States v. Odle*, 2021 WL 1820267, at *4 (D.S.D. May 6, 2021) (Viken, J.) (even after the March 29 revision, obesity alone with a BMI of 30.6 is not sufficient to state an extraordinary factor); *United States v. Contreras*, 2021 WL 1536504, at *5 (E.D. Tex. Apr. 19, 2021) (Crone, J.) (even following the March 29 update, being overweight with a BMI of

---

[5] *See, e.g.*, *United States v. Gonzalez*, 2021 WL 662496, at *2 (E.D. Pa. Feb. 19, 2021) (Pappert, J.) (even though the government states that obesity "permits consideration for compassionate release during the pandemic," "numerous courts in this Circuit have held that a BMI around or moderately above 35 is insufficient to present an extraordinary and compelling reason that may warrant release.") (citing cases); *United States v. Irizzary*, 2021 WL 735779, at *6 (E.D. Pa. Feb. 25, 2021) (Kearney, J.) (BMI of 33.1 of 38-year-old is not an extraordinary factor); *United States v. Concepcion*, 2021 WL 50852, at *7 (E.D. Pa. Jan. 6, 2021) (Slomsky, J.) (BMI of 32.2 does not justify release); *United States v. Hilario*, 2021 WL 322899, at *3 (E.D. Pa. Feb. 1, 2021) (Schmehl, J.) ("Given Defendant's relative youth (33 years old) and his lack of other risk factors, his mild obesity [BMI of 32.2] does not constitute an extraordinary and compelling reason for his release."); *United States v. Garcia*, 2021 WL 719763, at *4 (E.D. Pa. Feb. 23, 2021) (DuBois, J.) (a BMI of 31.8 and a history of smoking ten years earlier do not present an extraordinary circumstance); *United States v. Whitsell*, 2020 WL 3639590, at *4 (E.D. Mich. July 6, 2020) (Drain, J.) (declines to view obesity alone as sufficient; "Other district courts have granted compassionate release only upon a finding of numerous and severe medical conditions that place them at a significantly higher risk for severe illness from COVID-19."); *United States v. Edison*, 2020 WL 3871447, at *3 (D. Minn. July 9, 2020) (Frank, J.) (obesity alone (BMI of 35.4) "fails to meet the demanding standard for compassionate release."); *United States v. Aguilar*, 2020 WL 6081779, at *4 (N.D. Cal. Oct. 15, 2020) (Koh, J.) (relief denied to 27-year-old with BMI of 37.5; the court cites numerous cases and "notes that other courts have declined to grant compassionate release to otherwise healthy and young inmates with obesity as their only cognizable risk factor, absent other indications of serious medical risk.").

25.5 is not sufficiently extraordinary).  The Court need not adopt that reasoning here, however, because the defendant refused to accept the vaccine.

For all these reasons, compassionate release is not warranted here.  Further, even if the defendant were at elevated medical risk, relief should be denied.  This Court must then consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community.  *See United States v. Doe*, 833 F. App'x 366 (3d Cir. 2020) (per curiam) (not precedential) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon holding that the district court did not abuse its discretion in considering the nature of the offense, the defendant's history, and the status of the virus at the facility); *United States v. Bullock*, 833 F. App'x 934 (3d Cir. 2021) (per curiam) (not precedential) (granting motion for summary affirmance of denial of compassionate release, as the district court did not abuse its discretion in denying relief for medically vulnerable inmate upon considering the 3553(a) factors, including the substantial time remaining to be served on the sentence and the defendant's criminal history and institutional infractions).  At present, these considerations—including the defendant's risk of danger to the community, his refusal to accept vaccination, and BOP's strenuous efforts to protect inmates against the spread of COVID-19—counsel strongly against relief.

## CONCLUSION

In the end, the defendant committed multiple, serious crimes.  He was justly sentenced for his offenses.  While serving his sentence, the defendant has amassed a lengthy disciplinary record that includes the falsification of an order of the Court.  The defendant's medical conditions, when coupled with the care BOP can provide him for them, do not rise to the level of extraordinary and compelling reasons for release.  That conclusion is compounded by the defendant's refusal to be vaccinated.  At this point, his release would risk further spread of COVID-19 and thus be a danger to the community.  And, finally, the defendant has not exhausted his administrative remedies within BOP for compassionate release, without which he is not eligible for release.

To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred.  A court summarized: "The common features

of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic are either (1) properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that could warrant release even in the absence of a pandemic, or (2) in cases where the defendants had severe medical conditions that placed them at high risk of coronavirus complications, were housed at a facility with confirmed cases, and had served a large majority of their sentences." *United States v. Ball*, 2020 WL 4816197, at *6 (E.D. Mich. Aug. 19, 2020) (Lawson, J.). Courts have generally denied release in circumstances comparable to those presented here, even before the advent of widespread vaccination.

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.[6]

DATED: September 3, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

*/s/ Adam A. Reeves*

_____
ADAM A. REEVES
Assistant United States Attorney

---

[6] If, however, the Court concludes that immediate release is warranted, the government respectfully requests that the Court order a 14-day quarantine and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from the inmate to the public.